

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| IN RE: | § | No. 08-22-00026-CV |
| THE COMMITMENT OF GILBERT FIELDING. | § | Appeal from the |
| | § | 41st Judicial District Court |
| | § | of El Paso County, Texas |
| | § | (TC# 2020DCV3367) |

**<u>MEMORANDUM OPINION</u>**

A jury found that Appellant, Gilbert Fielding, is a sexually violent predator (SVP) under the Texas Civil Commitment of Sexually Violent Predators Act (the SVP Act). *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001-153. As a result, the trial court civilly committed him for sex-offender treatment and supervision. Appellant challenges the factual sufficiency of the evidence to support the jury's finding that he has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. The case turns on which of two qualified experts the jury chose to believe. Both experts used the same methodology, reviewed the same or similar materials, but reached opposite conclusions. Under our standard of review, we affirm.

## I.  BACKGROUND

### A.  Procedural History

In 2000, and again in 2007, Appellant was convicted of sexual assault and sentenced to prison. In 2020, and before his release from prison, the State petitioned to civilly commit Appellant under the SVP Act, which permits commitment of individuals upon a finding that they (1) are a "repeat sexually violent offender"; and (2) suffer "from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." TEX.HEALTH & SAFETY CODE ANN. § 841.003(a)(1), (2).

It was uncontested at trial that Appellant was a repeat sexually violent offender meeting the first element of the SVP Act. Only the second element—the "behavioral abnormality" requirement—formed the parties' dispute at trial. The case was tried to a jury that found both predicates for civil commitment under the SVP Act beyond a reasonable doubt. On appeal, Appellant challenges the sufficiency of the evidence to support the jury findings; we accordingly include a detailed review of the trial evidence.

### B.  Appellant's trial testimony

The State called Appellant as its first witness. At the time of trial, Appellant was serving a twenty five-year prison sentence for a 2006 sexual assault, his second incarceration following a five-year prison sentence for a 1999 sexual assault.

Appellant testified that he was first arrested at age eleven or twelve years old, but he could not recall the charge. He was placed on probation as a juvenile and sent to "TYC for juveniles" but again, Appellant denied having any memory of the offense or whether his probation had been revoked. He stated he could not remember at what age he was released from TYC, but recalled getting into trouble "a couple of times" afterward.

2

When questioned about his adult criminal history, Appellant admitted he had been to prison as an adult but similarly claimed he could not remember the number of times or the nature of the charges. Throughout the prosecutor's attempt to elicit from Appellant details about his criminal history, Appellant repeatedly denied memory about the offenses for which he had been arrested, convicted, or punished, simply retorting, "I can't remember." Appellant did agree that his first prison sentence was for three-and-a-half years, and that he had been placed on multiple terms of probation, some of which he had not successfully completed.

The trial testimony explored Appellant's two prior convictions for sexual assault. For the 2000 conviction, Appellant denied sexually assaulting the victim, Patricia. Instead, Appellant maintained that Patricia, while in a drunken state, followed him, grabbed him, took off her clothes, and then "tr[ied] to seduce [him] and . . . have sex." Appellant explained that if he hit Patricia, it was because he was trying to fight her off.

Following his release from prison for this first sexual assault, Appellant was arrested (but not convicted) for failure to register as a sex offender when he moved without reporting his address to the authorities. Appellant claimed he forgot what he was supposed to do and that "things happened so fast."

Roughly one-and-a-half years after his release from prison for his first sexual assault, Appellant was again arrested and convicted for sexual assault against a woman named Maribel. Appellant testified Maribel approached him after leaving a bar, attempted to enlist his help to obtain cocaine. When he tried to leave, Appellant similarly claimed she followed him, "seduced" him, and attempted to take his clothes off. Appellant stated he rebuffed her efforts, and during the process noticed that cash was missing from his wallet. "Pissed off" about this, Appellant hit Maribel, and when she tried to run away, he took her purse. Appellant denied sexually assaulting

3

Maribel, asserting she falsely accused him of rape to get "revenge" on him for striking her, and further claimed he only pleaded guilty because his attorney was ineffective. Appellant ratified a letter he had written to the parole board in which he stated he was "remorseful beyond measure" to Maribel but testified he was only remorseful for "hitting her . . . That's it. Nothing else."

Appellant also testified that through prior in-patient alcohol treatment he "learned about controlling [his] life and not commit crimes anymore and not hurt people," declaring he was "really concerned" and that he "underst[ood] what [he] did to this person." Appellant believed he had a problem with alcohol in the past but maintained he would not drink in the future because he was a "different person" now and did not want to go back to prison. Yet Appellant could not detail core concepts he was taught in sex-offender treatment; for instance, he could not identify his "offense cycle" or recognize his "triggering events" or "high-risk situations." Appellant insisted he was not a sex offender and had never sexually assaulted anyone.

During cross-examination, Appellant testified the only reason he had not consumed alcohol in the last sixteen-to-seventeen years was because it was unavailable in prison. When asked by his attorney if he thought alcohol had any effect on his law-breaking behavior, Appellant replied, "no," and stated he broke the law because he chose to do it. He testified that he was motivated to change and be a better person in hopes of seeing his family again.

## C. Dr. Jason Dunham's testimony

Forensic psychologist Dr. Jason Dunham testified as the State's second witness. Dr. Dunham testified he currently practices in the field of forensic psychology—the application of psychology principles to legal questions. Dr. Dunham specializes in SVP sex-offender risk assessments. Before becoming licensed in Texas in 2006, Dr. Dunham practiced in Washington state, where he completed his postdoctoral fellowship in the field of forensic psychology and began

4

conducting sex-offender evaluations under a statute like the Texas SVP Act. At the time of trial, Dr. Dunham had conducted roughly 500 sex-offender evaluations, 279 of which he conducted in Texas to determine "behavioral abnormality" under the SVP Act. Appellant did not challenge Dr. Dunham's qualification as an expert.

Dr. Dunham explained that "behavioral abnormality" is a legal (and not psychological) term and is defined under the SVP Act. The statutory definition emphasizes that the abnormality is a congenital or acquired condition that affects a person's emotional or volitional capacity. In doing so, it impairs a person's ability to control their desires, impulses, and even thoughts, and predisposes them to commit a predatory act of sexual violence. The predatory act is deliberate and not merely a "spur of the moment" impulse. Dr. Dunham defined "likely" as whether "there's a pretty good chance Mr. Fielding would commit another sex offense." In other words, Dr. Dunham explained, a behavioral abnormality is "some kind of condition, psychological or psychiatric, or otherwise, that makes this person likely to commit a future type of . . . violent sexual offense." The condition could emerge from various factors, such as a personality disorder or a sexual deviancy, or both, and is not exclusive to either.

Because there is no clinical or scientific test that will directly indicate whether someone meets the statutory definition for a behavioral abnormality, Dr. Dunham applied a "clinically adjusted actuarial approach" in evaluating Appellant. This approach—which he testified is generally accepted in the field—entails two steps. First, the reviewer identifies research-backed factors or traits, that measure the subject-offender's risk of committing a new sexually violent offense. Second, the evaluator uses their clinical judgment to adjust the calculation from the first step for a more accurate depiction of the offender's risk. Stated otherwise, Dr. Dunham balanced various adjusted risk factors (shown by scientific research to correlate to sexual-offense

5

recidivism) against protective factors, which generally help reduce the risk of recidivism resulting from the presence of those risk factors.

Both steps require the evaluator to review a myriad of records concerning the subject-offender, which in this case included records pertinent to Appellant's sexual and non-sexual criminal history, parole, medical, prison, and sex-offender-treatment program. Dr. Dunham also reviewed Appellant's pretrial deposition, the prison systems' in-house screening of Appellant for a behavioral abnormality, and a roughly two-hour-long clinical interview of Appellant over Zoom (due to pandemic restrictions). Dr. Dunham further employs two testing instruments commonly used by experts in evaluating sex offenders for potential behavioral abnormalities under the SVP Act: (1) the Static-99R, which assesses an offender's risk for being re-convicted of a sex offense; and (2) the Psychopathy Checklist Revised (PCL-R), which measures a person's psychopathy along a continuum.

Based his interview with Appellant, the records he reviewed, and testing done, Dr. Dunham diagnosed Appellant with: (1) an antisocial personality disorder, that is chronic and extreme to the degree of psychopathy; (2) an unspecified depressive disorder, well controlled with mediation; and (3) an alcohol-, cannabis-, and inhalant-use disorder, all in remission under a controlled environment. Relative to the first diagnosis, Appellant's thirty-two-point score on the PCL-R—in the top ten scores that Dr. Dunham had seen in any of his behavioral-abnormality evaluations—showed a high level of psychopathy. That psychopathy—a chronic, life-long, congenital or acquired condition—accounts for Appellant's overall lack of moral conscience, grandiose sense of self without regard for others, pathological lying, callousness and lack of remorse or empathy, a parasitic lifestyle in which he relied on others to provide for him, criminal versatility (in that

6

Appellant committed crimes across eight categories), and failure to accept responsibility for his actions.

In part, Dr. Dunham looked for patterns in Appellant's sexual criminal history to inform him of Appellant's risk of engaging in sexually violent behavior in the future. These patterns, in turn, help identify several risk factors relevant to the behavioral-abnormality question. And based on the risk factors, Dr. Dunham concluded that, to a reasonable degree of scientific certainty, Appellant suffered from a behavioral abnormality. Dr. Dunham found several significant patterns in how Appellant's prior sexual assaults actually occurred, compared to marked difference in how Appellant recalled them.

Based on his interview of Appellant and his review of the relevant records, Dr. Dunham related to the jury that Appellant committed his first sexual assault against a woman named Patricia when he was thirty-one years old. The victim was twenty years old and a stranger to Appellant. Patricia was in her backyard with some acquaintances of Appellant, and after they left, Appellant stayed behind. Patricia tried to get him to leave, at which point Appellant tried to kiss her. When Patricia resisted, Appellant grabbed her by the shirt, dragged her down the alley, across a pedestrian bridge, and through the gate of a school, all the while punching and beating her. Once at the school, Appellant pushed Patricia up against a fence and raped her; he then threw her on the ground and raped her again. Appellant also tried to put his penis inside Patricia's anus and mouth. Hearing Patricia's screams, bystanders ran towards the commotion, at which point they observed Appellant with his pants down before he ran away from the scene. Appellant received a five-year prison sentence for this assault. Nonetheless, during his interview with Dr. Dunham, Appellant denied the assault, asserting Patricia had tried to get him to buy her spray cans for sniffing, that

she tried to seduce him, and that when he rejected her, she became angry and fabricated the assault.[1]

After his release from prison, Appellant violently sexually assaulted another woman. By then, Appellant was thirty-seven years old and had been to prison twice (once for the assault against Patricia and once for burglary of habitation). Appellant encountered the victim, Maribel, outside a bar. Appellant, who had been drinking, approached Maribel and tried talking to her. When Maribel went inside the bar to sit with her friend, Appellant followed her and sat with them, which Maribel described as awkward. Maribel left the bar to find a cab. Appellant followed her, grabbed her by the arm, and demanded sex. He took Maribel down to the ground, removed her pants, slammed her face onto the concrete, and forced his penis inside her mouth. Maribel gagged and screamed while Appellant called her a "bitch" and told her to "suck his dick." A half-naked Maribel eventually made her escape. Witnesses described Maribel as screaming hysterically, with her face bloodied. Appellant was later found with Maribel's purse in his possession; he was convicted and sentenced to twenty-five years' confinement.

Appellant similarly told Dr. Dunham that he had not sexually assaulted Maribel. He maintained that he merely hit her because, following her unsuccessful attempts to seduce him and procure cocaine from him, she stole money from him. Appellant asserted that he was "more of [a] victim" than Maribel because she stole from him and that Maribel was the instigator, flirting with him and taking her pants off to try to get sex from him.

---

[1] Dr. Dunham relayed that Appellant had also been charged with, but not convicted of another sexual assault. In this incident, the twenty-three-year-old alleged victim approached Appellant and his friend at their car and asked for cocaine. Appellant took the woman to his apartment under the pretense of providing her with cocaine, but when they arrived, he threw her onto the bed, slapped her, and raped her. The woman escaped to the neighbor's apartment and called the police. Appellant denied committing the assault, telling the police that the sex was consensual, but he told Dr. Dunham that he and the woman never had sex.

Based on his review of all relevant information, Dr. Dunham identified several risk factors for future predatory acts, including: (1) Appellant's failure or inability to accept responsibility for his crimes; (2) a persistent, narcissistic pattern of engaging in victim blaming and denigration while painting himself as the victim; (3) difficulty progressing in sex-offender treatment as a result of his recalcitrant refusal to accept responsibility for his actions; (4) a high level of physical force used to perpetrate his sexual offenses; (5) persistence in criminality following punishment, particularly in Appellant's sexual assault of Patricia seven months after being placed on mandatory supervision for burglary; (6) a lack of empathy and remorse; (7) poor appraisal of his own risk; (8) substance abuse; (9) the status of Appellant's victims as strangers (versus person known to him); and (10) Appellant's willingness to sexually assault a stranger while being in a live-in relationship. Particularly, Dr. Dunham posited Appellant's "AB, AB" pattern of sexual criminality—comprised of (A) conforming to prison rules during incarceration and then (B) sexually assaulting someone upon release—showed he was likely to commit another sexual assault if released.

Moreover, Appellant's Static-99R score of four showed an at-least-above-average risk for sexual recidivism when compared to other sex offenders. Still, in Dr. Dunham's opinion, because the Static-99R does not account for many of the discussed risk factors, this score actually "underestimates [Appellant's] risk . . . [because] there are too many factors that this test cannot measure," further explaining that Appellant's dynamic factors (those factors he can control or change) were "very poor." Dr. Dunham did not identify any protective factors that would reduce Appellant's sexual-recidivism risk. Dr. Dunham assessed Appellant's risk of committing another sexually violent offense at "very high."

### D. Dr. Marisa Mauro's testimony

Appellant presented the testimony of forensic psychologist Dr. Marisa Mauro. Dr. Mauro's background included her experience as a licensed sex-offender-treatment provider for the California prison system, where she predominantly evaluated the offender population (including sex offenders) to determine an offender's "danger to self and others." The job included administering general psychological exams, IQ testing, and sentencing-recommendation evaluations. At the time of trial, Dr. Mauro had conducted between 250 and 300 behavioral-abnormality evaluations in Texas, most of which resulted in a finding of a behavioral abnormality. Dr. Mauro testified her past work in treating sex offenders helped her conduct sex-offender risk assessments. She also testified her completion of just under four semesters of law school enabled her to read and understand law relevant to her practice as a forensic psychologist.

Dr. Mauro contended that Appellant did not currently suffer from a behavioral abnormality, which, in her opinion, required a finding that the offender was "something greater" than merely inclined to commit a sexually violent offense. She agreed that "likely" should be assigned its plain meaning under the SVP statute and is synonymous with "probable." Notably, Dr. Mauro testified the legislative findings preceding the statutory language of the SVP Act were "most important to [her]." In that regard, Dr. Mauro told the jury the purpose of the SVP Act was to "identify a . . . small but extremely group [sic] of sex offenders that were not amenable to traditional forms of mental health treatment."

Like Dr. Dunham, Dr. Mauro employed the same principles widely accepted in the field; she used a clinically adjusted actuarial approach that accounted for risk and protective factors, implemented similar risk-assessment instruments (the Static-99R, the Static-2002R, and PCL-R), reviewed relevant records, and conducted a four-and-a-half clinical interview of Appellant.

10

Dr. Mauro similarly diagnosed Appellant with antisocial personality disorder, psychopathy, and alcohol-use disorder in remission in a controlled environment, all of which were risk factors for sexual recidivism. Explaining that scoring the subject-offender under both Static-99R and the Static-2002R may yield a more-accurate picture on risk, Dr. Mauro applied both instruments, scoring Appellant at a five and six, respectively. Dr. Mauro also scored Appellant at a thirty-two under the PCL-R, which she testified was "consistent with psychopathy." But because the PCL-R incorporates historical traits, and not current ones, Dr. Mauro believes it did not adequately account for Appellant's good behavior while institutionalized the past ten-to-fifteen years. As such, Dr. Mauro did not believe Appellant's psychopathy was as important in this case.

Dr. Mauro's methodology differed most in her evaluation of Appellant's lack of a paraphilia diagnosis as a "neutral factor," which she explained was of particular importance given the legislative findings' focus on "a small but extremely dangerous population." She defined paraphilia as: "a category of diagnoses in the DSM-5 relating to sexual defiance [sic]. So specific paraphilias would be things like pedophilia or the sexual attraction to pre-pubescent children, sadism." Dr. Mauro explained that the lack of a diagnosis of a sexual deviance was "the most relevant" in this type of case, asserting that "the condition most likely to cause somebody to commit a sexually violent offense is going to be a paraphilia." Nonetheless, she agreed that behavioral abnormalities did not require a diagnosis of paraphilia and that she had found the presence of a behavioral abnormality in the past when she did not make a paraphilia diagnosis.

As for Appellant's protective factors, although she acknowledged that Appellant had yet to complete sex-offender treatment (due to his transfer out of prison pending the instant trial), she stated any information Appellant might have learned before pausing treatment should be

11

considered. That Appellant appeared to have support from friends and family and the ability to find employment were also protective factors under Dr. Mauro's evaluation.

Ultimately, Dr. Mauro opined Appellant did not suffer from a behavioral abnormality because he did not have a paraphilia, explaining that Appellant's diagnosed condition (antisocial personality disorder) would not cause him to commit a sexually violent offense in the future because his sexual offenses were "pretty typical" and "very opportunistic." In summary, Dr. Mauro's conclusion was that antisocial personality disorder was insufficiently "discriminating" in the criminal population such that it would not rise to the level of placing Appellant in the "small but extremely dangerous group" of sex offenders described in the SVP Act's legislative findings. Dr. Mauro also disagreed that past behavior was the best predictor of future behavior.

On cross-examination, however, Dr. Mauro agreed that Appellant, compared to other sex offenders, had a greater-than-average risk for committing a new sexually violent offense. Specifically, Dr. Mauro agreed that (1) Appellant was more than twice as likely to re-offend than the average sex offender; (2) that the Static instruments did not account for various factors exhibited by Appellant, such as victim blaming and denigration; (3) that by disinhibiting him of his impulses, Appellant's past alcohol or substance abuse during his sexual crimes put him at a higher risk of re-offending if he resumed using alcohol and drugs, which was "very possible" if released; (4) that Appellant minimized his problems and criminal history in general and had poor insight into his own level of risk; (5) that homelessness, which Appellant had no plan for avoiding, was also a risk factor for him ; and (6) that, although considered a protective factor by Dr. Mauro, Appellant's past ability to work had not prevented him from sexually assaulting two women.

As for her opinion on the relevance of Appellant's lack of paraphilia diagnosis, Dr. Mauro conceded that the SVP statute did not require that specific diagnosis. She also conceded that

Appellant's alcohol-use disorder, which had persisted despite having received in-patient treatment in the past, was an acquired condition that had affected Appellant's emotional or volitional capacity. Dr. Mauro agreed that it was "very possible" that Appellant would relapse if released because he was considered a "treatment failure" in terms of his substance abuse disorder. And although Dr. Mauro emphasized Appellant's abstinence from criminal violations during his current prison term, she also concurred that Appellant had shown good behavior during his two previous prison terms, after both of which he still committed violent sexual offenses. She also conceded that the power dynamics between Appellant and female prison guards were very different than those between Appellant and women in the free world.

## II. DISCUSSION

In a single issue, Appellant challenges the factual sufficiency of the evidence to support his civil commitment under the SVP Act.

### A. The SVP Act generally

In enacting the SVP Act, the Legislature found that:

> [A] small but extremely dangerous group of sexually violent predators exists and that those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence. . . . Thus, the legislature finds that a civil commitment procedure for the long-term supervision and treatment of sexually violent predators is necessary and in the interest of the state.

TEX. HEALTH & SAFETY CODE ANN. § 841.001; *see also In re Commitment of Fisher*, 164 S.W.3d 637, 639-40 (Tex. 2005).

To establish that an individual is an SVP, the State must prove that the individual: (1) is a "repeat sexually violent offender"; and (2) "suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." TEX. HEALTH & SAFETY CODE ANN.

13

§ 841.003(a)(1), (2). Under the first element of the SVP statute, a person is a "repeat sexually violent offender" if "the person is convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses . . . ." *Id*. § 841.003(b). Relevant here, sexual assault is a sexually violent offense, and Appellant does not challenge this element on appeal. *Id.* § 841.002(8)(A); *see also* TEX.PENAL CODE ANN. § 22.011.

As to the second element, which Appellant contests on appeal, a "[b]ehavioral abnormality" is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." TEX.HEALTH & SAFETY CODE ANN. § 841.002(2). Only these two elements need to be proven by the State, and courts have uniformly rejected attempts to incorporate additional sub-requirements into these elements. *See, e.g.*, *In re Commitment of Stoddard*, 619 S.W.3d 665, 677 (Tex. 2020); *In re Commitment of Williams*, 539 S.W.3d 429, 438-39 (Tex.App.--Houston [1st Dist.] 2017, no pet.); *In re Commitment of Hall*, No. 09-09-00387-CV, 2010 WL 3910365, at *2-3 (Tex.App.--Beaumont Oct. 7, 2010, no pet.)(mem. op.).

The State bears the burden of proving these two elements beyond a reasonable doubt. TEX.HEALTH & SAFETY CODE ANN. § 841.062.

## B. Factual-sufficiency challenge

### 1. The standard of review

"A commitment proceeding under the SVP Act is the unusual civil case incorporating the 'beyond a reasonable doubt' burden of proof typically reserved for criminal cases." *Stoddard*, 619 S.W.3d at 674; *see also Fisher*, 164 S.W.3d at 639-41; TEX.HEALTH & SAFETY CODE ANN. § 841.062. *Stoddard* requires us to apply the factual-sufficiency standard as follows:

The appellate standard governing a factual-sufficiency review of a finding that a person is a sexually violent predator is whether, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of the verdict, along with undisputed facts contrary to the verdict, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met.

619 S.W.3d at 678. *Stoddard* further instructs that an appellate court may not usurp the jury's role of determining the credibility of witnesses and the weight to be given their testimony; rather, we presume that the factfinder resolved disputed evidence in favor of the challenged finding if a reasonable factfinder could do so. *Id.*

### 2. The evidence is factually sufficient to support the jury's finding of behavioral abnormality

In his factual-sufficiency challenge, Appellant contends "[t]here is no indication that [he] has [a behavioral abnormality] that prevents him from controlling his impulses or behavior." He suggests this is so because Dr. Dunham's identification of a sexual deviance hinged on Appellant's prior criminal convictions, asserting "[t]here must be more proof of a sexual deviance than just an expert declaring someone as sexually deviant because they have two convictions for sexual assault over 18 years ago." As such, Appellant maintains, the evidence is factually insufficient to prove he "fit[s] into the 'small but extremely dangerous group of sexually violent predators' for which the Texas Legislature intended the SVP Act."

His argument is misplaced. First, if Appellant predicates his claim on the notion that a behavioral abnormality must "prevent" him from controlling his behavior, it is unsupported by the plain language of the SVP statute. The Act merely requires that the congenital or acquired condition underpinning the behavioral abnormality *affect* the offender's volition or emotional capacity and thus *predisposes* him to committing a sexually violent offense. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.002(2). In other words, the condition must simply afflict the subject-

15

offender with a "*difficulty* controlling [his] behavior that predisposes [him] to sexual violence to the extent they become a menace to the health and safety of others." *See In re Commitment of Lopez*, 462 S.W.3d 106, 111 (Tex.App.--Beaumont 2015, pet. denied)(emphasis added); *see also Fisher*, 164 S.W.3d at 646 (noting the United States Supreme Court found Kansas' civil-commitment statute satisfied due process where it required a finding of future dangerousness and then linked that finding to the existence of a "mental abnormality" or "personality disorder" that made it *difficult*, if not impossible, for the person to control his dangerous behavior).

Second, although the medical diagnosis of the subject-offender's mental health may inform an assessment of whether he has a behavioral abnormality, "the principal issue in a commitment proceeding is not a person's mental health but whether he is predisposed to sexually violent conduct." *In re Commitment of Lewis*, 495 S.W.3d 341, 346 (Tex.App.--Beaumont 2016, pet. denied), *citing In re Commitment Bohannan*, 388 S.W.3d 296, 306 (Tex. 2012). For that reason, a medical diagnosis is not required evidence in SVP cases. *See, e.g.*, *In re Commitment of Jackson*, No. 05-20-00519-CV, 2021 WL 4588514, at *6 (Tex.App.--Dallas Oct. 6, 2021, pet. denied) (mem. op. on reh'g). Nor does Appellant direct us to any legal authority for the proposition that a paraphilia diagnosis must be made before a person may be civilly committed under the SVP Act. Indeed, Dr. Dunham testified that a behavioral abnormality could result from various conditions, including a personality disorder or a sexual deviancy (both of which Dr. Dunham found to be present). Dr. Mauro did not dispute Dr. Dunham's testimony that behavioral abnormalities did not require a diagnosis of paraphilia and that she had, in the past, personally made an affirmative finding on behavioral abnormality without making a paraphilia diagnosis. And as to Appellant's related complaint that Dr. Dunham premised Appellant's sexual deviance solely on the fact that he had been twice convicted for sexual assault, our review of the record shows Dr. Dunham

16

explained it was the *details* of Appellant's sexually violent behavior (which informed the existence of various risk factors), and not the mere existence of a sexual criminal record, that formed the predicate for Dr. Dunham's evaluation of Appellant's behavioral abnormality. Specifically, although Appellant was not diagnosed with a paraphilia, Dr. Dunham explained Appellant's psychopathy had manifested itself in his history of sexually assaulting women with brute force, which evinced a sexual deviance that bordered on sexually sadistic behavior. Dr. Dunham concluded it was Appellant's antisocial personality disorder and psychopathy that drove his sexual abuse of adult victims. In short, Dr. Dunham concluded Appellant was a "sexual psychopath."

Finally, if Appellant claims the evidence is factually insufficient to prove he falls within the "small but extremely dangerous group" referenced in the SVP Act's legislative findings, Appellant fails to present a proper factual sufficiency challenge. It is now well-settled that the State need not prove that an SVP is part of a "small but extremely dangerous group . . . not amenable to traditional mental health treatment modalities," and we decline Appellant's invitation to find the evidence factually insufficient on this basis. *See, e.g.*, *Stoddard*, 619 S.W.3d at 669, 677; *Tryon*, 2022 WL 3649375, at *7 (nothing *Stoddard*'s explicit holding that the SVP Act's legislative findings are not part of the statute's definition of "sexually violent predator" and thus are not an element the jury must consider or find); *In re Commitment of Stratton*, 637 S.W.3d 870, 887 (Tex.App.-- Eastland 2021, no pet.)(holding legislative findings are irrelevant and not part of the statutory requirements for committing an SVP under the SVP Act); *In re Commitment of Gunter*, No. 11-20-00253-CV, 2022 WL 3902735, at *5 (Tex.App.--Eastland Aug. 31, 2022, no pet. h.)(mem. op.)(noting *Stoddard*'s rejection of appellant's claim that the evidence was insufficient to prove appellant's membership in "a small but extremely dangerous group of sexually violent predators" mentioned in the SVP Act's legislative findings).

Turning to the proper legal-sufficiency standard, Dr. Dunham (whose qualifications are not challenged) testified that based on a holistic evaluation of Appellant—and on methodologies accepted in the field—Appellant is a "sexual psychopath" who suffers from a congenital or acquired condition that affects his emotional or volitional capacity, predisposing him to commit a sexually violent offense, to the point that he is a menace to the health and safety of another. His testimony matched the legal definition of behavioral abnormality. *See* TEX.HEALTH & SAFETY CODE ANN. § 841.002(2). Dr. Dunham described his consideration of various research-based factors in arriving at his opinion. For instance, Dr. Dunham considered, but ultimately rejected, Appellant's partial completion of sex-offender treatment and his more-advanced age as protective factors and he explained to the jury his rationale for doing so. Likewise, Dr. Dunham acknowledged Appellant's fair institutional adjustment as a positive factor, but weighed this factor as insufficient to discount Appellant's very high risk of sexual recidivism given his demonstrated pattern of committing exceedingly violent sexual offenses following periods of good institutional adjustment.

While Appellant's testimony contradicted some of the factual underpinnings of Dr. Dunham's expert testimony—for instance, by minimizing the pervasiveness and seriousness of his criminal history, or denying that he was a sex offender, or contending he was now a "different person" the jury was free to disregard Appellant's overall internally inconsistent testimony as self-serving or not credible. *See In re Commitment of White*, No. 14-17-00115-CV, 2018 WL 344063, at *8 (Tex.App.--Houston [14th Dist.] Jan. 9, 2018, no pet.)(mem. op.)(the jury could have considered appellant's inconsistent statements when evaluating his credibility about his acceptance of his problem and intentions not to re-offend in the future).

To be sure, Dr. Mauro disputed whether Appellant currently suffered from a behavioral abnormality. But we cannot say this disputed evidence is the kind that no rational juror could have discounted in reaching the verdict. While Dr. Mauro testified about her qualifications, experience, and methodology, she also conceded various points that supported Dr. Dunham's opinion. For instance, she agreed that: Appellant was more-than-twice as likely to re-offend than the average sex offender; the Static instruments failed to consider various factors that increased Appellant's sexual-recidivism risk; Appellant's history of homelessness and alcohol and substance abuse, as well his current denial and minimization of his crimes, reflected poor insight into his own level of risk (all of which were risk factors for future sexual violence); and Appellant's history of employability and positive institutional adjustment, though considered by Dr. Mauro as either protective or positive factors, had not prevented Appellant from violently and sexually assaulting women in the past.

Based on state of this disputed evidence, the jury had ample bases for reasonably discounting Dr. Mauro's opinion against other evidence before it in favor of the verdict. In short, the jury faced two competing narratives about Appellant and competing opinions about whether he suffers from a behavioral abnormality. By its verdict the jury chose to believe the State's evidence and disbelieve Appellant's evidence. And even in a factual sufficiency review, we may not substitute our judgment for that of the jury—the sole judge of the credibility and the weight to be given to witnesses' testimony. *See Stoddard*, 619 S.W.3d 665, 677 (noting it was error for the appellate court to substitute its own judgment for that of the jury in holding that the expert's testimony, though founded in evidence-based support, was "simply not enough"). Most importantly, we do not find that the remaining evidence contrary to the behavioral-abnormality

finding is so significant given the entire record such that the jury could not have determined beyond a reasonable doubt that its finding was true. *Id.*

We therefore hold that the evidence here was factually sufficient to prove Appellant had the requisite behavioral abnormality under the SVP Act, and we overrule his sole issue presented for review.

### III. CONCLUSION

Having overruled Appellant's sole issue, we affirm the trial court's judgment and order of civil commitment.

JEFF ALLEY, Justice

December 07, 2022

Before Rodriguez, C.J., Palafox, and Alley, JJ.